Submitted on record and brief May 12, affirmed June 23, 2004

Victoria CASTRO,
*Respondent,*

*v.*

Dan HEINZMAN,
*Appellant.*

CCV 0303234; A121443

92 P3d 758

Jeffrey L. Olson filed the brief for appellant.

No appearance for respondent.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Brewer, Judges.

BREWER, J.

---

* Deits, C. J., *vice* Armstrong, J.

## BREWER, J.

The trial court granted petitioner a permanent stalking protective order (SPO) against respondent. *See* ORS 30.866. Respondent appeals, and the issue is whether the evidence supported issuance of the SPO. We review the facts *de novo*, *Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999), giving deference to the trial court's express and implicit credibility determinations.[1] We affirm.

Petitioner and respondent met in July 2002, while both were employed by the Oregon Youth Authority at the MacLaren Youth Correctional Facility. Respondent's duties initially justified his having work-related telephonic or in-person contact with petitioner. In August 2002, respondent asked petitioner whether she worked out at a fitness facility and, in an ensuing conversation, petitioner told respondent that she exercised at a gym in Wilsonville. Respondent joined that gym and, over the next few months, the parties became friends. They developed an intimate relationship during the fall of 2002.

In November 2002, petitioner began to lose romantic interest in respondent because of his "manipulative" personality, his excessive consumption of alcohol, and statements that he made to her concerning sexual matters and domestic violence in one of his previous marriages. In late December

---

[1] In *Bryant v. Walker*, 190 Or App 253, 255, 78 P3d 148 (2003), *rev allowed*, 337 Or 34 (2004), we cited *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002), for the proposition that, in reviewing the sufficiency of the evidence to support the issuance of a SPO, we view "[t]he facts * * * (along with all reasonable inferences that can be drawn from them) in the light most favorable to [the prevailing party]." In *Delgado*, the Supreme Court used that standard to review the trial court's denial of a motion to dismiss an SPO petition at the close of the petitioner's case. 334 Or at 134. Here, no such motion was made before the trial court. Instead, respondent's challenge to the sufficiency of the evidence invokes this court's *de novo* review of the entire record before the trial court. *Michieli v. Morgan*, 192 Or App 550, 552, 86 P3d 688 (2004); *Tumbleson v. Rodriguez*, 189 Or App 393, 395, 76 P3d 169 (2003).

On appeal, respondent's statement of facts frequently casts the evidence and reasonable inferences that it may support in a way that favors respondent's version of what happened. The trial court implicitly found petitioner and her witnesses to be more credible. We therefore have resolved those factual disputes in petitioner's favor and describe the facts accordingly.

2002, the relationship came to an end when respondent insistently complained that petitioner had failed to call him at a certain time and, a few days later, sent her an unwanted Christmas gift at work with a "poor me" letter. Petitioner returned the gift. On December 24, when respondent called to question the return of the gift, petitioner told him that "it was nothing more than a friendship between them." On December 26, respondent called petitioner again. Petitioner told respondent that their "connection was over" and that she "did not want to ever see him again [or] hear from him." On December 27, respondent, while intoxicated, left a message on petitioner's answering machine, urging her to continue their relationship. In addition, respondent sent petitioner e-mails to the same effect. Respondent also sent petitioner copies of e-mails that he had sent to his cousin, in which respondent discussed intimate details of his relationship with petitioner and expressed consternation over the termination of their relationship.

In early January, another employee at MacLaren—a friend of petitioner—told petitioner that she had heard a rumor that respondent was claiming to know intimate things about the friend. The friend complained about the rumor to respondent's supervisor. When confronted by his supervisor, respondent stated that petitioner had broken off the parties' relationship and that petitioner must have been the source of the rumor. The supervisor then contacted petitioner. On January 12, 2003, petitioner provided the supervisor with a written statement that detailed her concerns about respondent's manipulative and obsessive behavior. Petitioner asked the supervisor to obtain a signed statement from respondent assuring her that he would leave her alone and "not spread false rumors" about her. According to petitioner, respondent's supervisor told him not to contact her at work or on his personal time. Petitioner was so concerned about respondent's behavior that she moved to a new residence.

On an occasion in mid-January, respondent came to petitioner's work area several times during the same shift. According to a witness, respondent "was talking to her about a work issue that * * * anyone else would handle over the phone. And he just kept coming back and talking to [petitioner]." On a second occasion in January, respondent came

to petitioner's work area when she was alone. On that occasion, "he did not leave until [petitioner] reached for the phone and * * * made it clear that he needed to leave." In addition, on February 27, respondent came to petitioner's work area to deliver medications as part of his job duties.[2]

Both parties continued to work out at the same gym in January and February 2003. Petitioner used the gym with caution. If respondent's vehicle was parked there, she would leave and return later. In late February, however, petitioner went to an exercise room and found respondent using a machine. Petitioner then left to work out in a women-only room. As petitioner was leaving the gym, she walked past respondent, who was standing next to a drinking fountain. He then stood around, "pretended to work out," and disappeared.

After respondent saw petitioner at the gym, he sent her a flurry of e-mails from February 24 through 28, expressing dismay at the breakup of their relationship and asking her to reconsider her decision to end the relationship. Respondent also left numerous telephone messages on petitioner's answering machine. In the e-mails, respondent adopted a love-struck tone that bemoaned petitioner's desire to be free of him. In an e-mail dated February 27, respondent stated, "I can't believe that I didn't haul you off to some solitary place....damn the realities.....and just hold you.....for eternity........DAMN the realities." In another e-mail sent the same day, respondent likened the parties' relationship to a "batter[ing]" wild river experience. He stated, "I revel in the secrecy.......I think that one time in my arms again would destroy the demon of misunderstanding that has tried so hard to destroy the essence." The other e-mails also were replete with respondent's proclamations of love and devotion to petitioner.

Respondent supplemented the e-mail barrage with in-person contacts. After seeing petitioner at the gym,

---

[2] The record is unclear whether the parties actually had contact at work after petitioner communicated with respondent's supervisor. In a written statement dated March 9, 2003, received in evidence as Exhibit 1, petitioner stated that, after she contacted respondent's supervisor, respondent did not make contact with her at work.

respondent approached her there on three consecutive days. On the first occasion, petitioner "didn't react or give him the time of day." On the second occasion, respondent pursued an "extensive intense 'philosophical' conversation." Petitioner cut her workout short and left. On the third day, respondent asked petitioner "about reconnecting sexually." Petitioner declined. When he left the gym, respondent was standing outside in the parking lot. From that vantage point, he called her from a cell phone and further "pressed" her "on the issue." Petitioner again declined to renew the relationship. She then went home and sent respondent an e-mail reiterating her demand that he leave her alone. In a later e-mail, petitioner asked respondent to find another workout location. Respondent replied by e-mail, "I'm laughing.....you were joking ......right?"

On March 11, 2003, petitioner filed a petition for a temporary SPO against respondent. After an evidentiary hearing, the trial court made the SPO permanent and of unlimited duration.

On appeal, respondent makes three assignments of error. He argues (1) that the trial court erroneously issued the permanent SPO "based largely if not entirely on non-threatening telephone calls and e mails"; (2) that petitioner failed to establish that she actually was alarmed or coerced by respondent or that any such alarm or coercion was objectively reasonable; and (3) that the court based its decision on "personal biases."[3]

■ The civil stalking statute authorizes a court to issue an SPO against someone who intentionally, knowingly, or recklessly makes repeated and unwanted contact with another person, or a member of that person's immediate family or household, causing that person to be alarmed or coerced. ORS 30.866(1)(a). The contact may consist of, among other things, coming into the person's visual or physical presence, following the person, waiting outside the person's home, property, place of work or school, or sending or making written communications of any kind. *See* ORS 163.730(3)

---

[3] Petitioner did not file a brief on appeal.

(providing definition of "contact" for both the civil and criminal stalking statutes); *Weatherly v. Wilkie,* 169 Or App 257, 259, 8 P3d 251 (2000). Additionally, a person seeking the SPO must prove that he or she in fact was alarmed or coerced as a result of the repeated and unwanted contacts, and it must be objectively reasonable for that person to have been alarmed or coerced. *See id.* (discussing subjective and objective components). "Alarm," for purposes of the issuance of an SPO, means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Coerce" means "to restrain, compel or dominate by force or threat." ORS 163.730(2). Finally, the repeated and unwanted contacts must also cause the person reasonable apprehension regarding his or her personal safety or the safety of a member of his or her immediate family or household. ORS 30.866(1)(c).

■ Potential constitutional problems arise when the petitioner relies on contacts that involve expression. In that circumstance, to avoid constitutional overbreadth problems, the contacts must meet a more stringent standard than the one set out in the statute. *See State v. Rangel,* 328 Or 294, 300, 977 P2d 379 (1999); *see also Hanzo,* 152 Or App at 542. That more stringent standard requires the contacted person to prove that the contacts involved threats that "instill[ ] in the addressee a fear of imminent and serious personal violence from the speaker, [are] unequivocal, and [are] objectively likely to be followed by unlawful acts." *Rangel,* 328 Or at 303. Contacts that do not involve expression need to satisfy only the less stringent statutory standard. *Boyd v. Essin,* 170 Or App 509, 514, 12 P3d 1003 (2000), *rev den,* 331 Or 674 (2001).

■ Respondent's first assignment of error, as we understand it, asserts that, in issuing the permanent SPO, the trial court relied primarily, if not exclusively, on expressive e-mail and telephone contacts that were neither overtly nor implicitly threatening. According to respondent, his written and verbal entreaties to petitioner in January and February 2002, although unwanted, were innocuous and, therefore, not actionable. Respondent relies on *Hanzo.* In that case, the respondent, the leader of an antiabortion group, editor of an antiabortion magazine, and editorial supporter of violence directed at abortion providers, organized and participated in

at least two protests outside the home of the petitioner, who was the executive director of an abortion clinic. The respondent also distributed written antiabortion materials in the petitioner's neighborhood. *Hanzo*, 152 Or App at 530-32. In addition, the respondent telephoned the petitioner at her home, and the respondent's group sent petitioner numerous written materials, including a postcard depicting a fetus on a cross and a pamphlet describing petitioner as a "notorious * * * child-killer." *Id.* This court nevertheless reversed the SPO, reasoning that each of the contacts between the parties involved expression and that none of the contacts contained an unambiguous, unequivocal threat to the petitioner. *Id.* at 544.

Respondent concedes that, on December 26, 2002, petitioner told him that she did not want to see or hear from him again. However, according to respondent, like the expressive contacts in *Hanzo*, respondent's e-mail and telephonic communications to petitioner after December 26 were unwanted but "non-threatening." He also urges that the in-person contacts at work and the gym were nonconfrontational.

We agree with this much of respondent's thesis: None of his statements to petitioner constituted an overt threat of physical violence. Nevertheless, many of respondent's contacts with petitioner—particularly his statements in the late February e-mails, considered in combination with his in-person encounters with petitioner at the gym during that time—would alarm a reasonable person. For example, respondent repeatedly alluded to his fantasies—some of them coercive in nature—of resuming a sexual relationship with petitioner. More significantly here, however, respondent's expressive contacts provide context for his nonexpressive contacts. *See Boyd*, 170 Or App at 518 n 11. Specifically, among other nonexpressive conduct, after respondent's supervisor instructed him not to contact petitioner at work, he repeatedly approached her at the gym. In addition, respondent continued to engage in such conduct despite petitioner's repeated requests that he leave her alone; when petitioner asked him to find another workout facility, he purported to treat her request as a joke. Respondent's conduct

was particularly disturbing in light of his admission to petitioner that he had been violent toward a former spouse.[4]

Respondent's pattern of nonexpressive conduct in this case is similar in some respects to the conduct of the respondent in *Delgado v. Souders*, 334 Or 122, 124, 137-38, 46 P3d 729 (2002), where the Supreme Court upheld an SPO against the respondent's challenge that the evidence was insufficient to show that he had engaged in stalking behavior under ORS 30.866(1). In that case, the petitioner was a college student, and the respondent repeatedly appeared in her presence while she was walking on campus. *Id.* at 124-26. Once, he cut across the street and passed within two or three feet of her. *Id.* Another time, he appeared suddenly within a foot of her on a secluded part of the campus. *Id.* A number of times, he placed himself near her at the school library. *Id.* He never said anything to her although once he appeared on the verge of saying something. *Id.* The petitioner in *Delgado* experienced severe anxiety as a result of the respondent's actions even though there was no evidence that the respondent had previously been violent or assaultive. In *Delgado*, the court rejected the respondent's argument that his conduct was innocuous. *Id.* at 136-37. Instead, the court held that his conduct was sufficient to warrant the issuance of a stalking protective order. *Id.* at 137-38.

In this case, respondent's acts of physically approaching petitioner at the gym and in other locations were more overt and intrusive than the respondent's acts in *Delgado*, particularly when considered in light of respondent's professed history of domestic violence, which was absent in *Delgado*.

We conclude that respondent engaged in repeated unwanted contact with petitioner and that several of those contacts, including his physically approaching petitioner at work, in the gym, and in the gym parking lot, were not purely expressive. Therefore, we need not consider whether those

---

[4] Petitioner stipulated at the evidentiary hearing that respondent's former spouses, who were present at the hearing, would testify that respondent had not been violent toward them. However, as the trial court observed in a different context, the issue is what respondent told petitioner, not whether it was true.

contacts satisfied the additional proof requirements pre-scribed in *Rangel* for the issuance of an SPO. *See State v. Shields*, 184 Or App 505, 511, 56 P3d 937 (2002), *rev den*, 335 Or 355 (2003) (holding that, in criminal stalking case, nonex-pressive contacts were sufficient to prove stalking charge whether or not expressive conduct satisfied the *Rangel* test); *see also Pinkham v. Brubaker*, 178 Or App 360, 370-71, 37 P3d 186 (2001) (same). Accordingly, we reject respondent's first assignment of error.

■     The preceding discussion also informs our disposi-tion of respondent's second assignment of error, in which he asserts that the evidence failed to show that petitioner reasonably was alarmed by his conduct. Respondent's contin-uing course of unwanted behavior caused petitioner to expe-rience apprehension of physical harm, even to the point of moving her residence. We conclude that her reaction was reasonable. Accordingly, we reject respondent's second assignment of error without further discussion.

■     Finally, we turn to respondent's third assignment of error, in which he asserts that the trial court was impermis-sibly biased against him. In support of that charge, respon-dent relies on several comments that the trial judge made during the course of the hearing. Suffice it to say that none of those remarks showed bias. Both parties appeared *pro se* at the evidentiary hearing, and the trial court properly asked each of them questions in aid of its effort to resolve the merits of their dispute. The court gave both parties a reasonable opportunity to present relevant evidence, and its comments in explanation of its view of the evidence, although unpalat-able to respondent, were meant to convince him to leave peti-tioner alone. Giving that advice was not error.

Affirmed.