Submitted on record and brief October 26, 2005, reversed February 15, 2006

Constance E. HOLLON,
*Respondent,*

*v.*

Rochelle WOOD,
*Appellant.*

CV04-0366; A126960

129 P3d 709

Rachel Negra filed the brief for appellant.

No appearance for respondent.

Before Edmonds, Presiding Judge, and Linder and Wollheim,* Judges.

LINDER, J.

---

* Wollheim, J., *vice* Richardson, S. J.

## LINDER, J.

Respondent appeals from a judgment granting petitioner's request for a permanent stalking protective order (SPO), challenging the sufficiency of the evidence to support the order.[1] On *de novo* review of the facts, ORS 19.415(3); *Castro v. Heinzman*, 194 Or App 7, 9, 92 P3d 758 (2004), we reverse.[2]

The controlling legal standards are not disputed. Briefly summarized, and as applicable to this case, the civil stalking statute authorizes a court to issue an SPO against someone who intentionally, knowingly, or recklessly makes "repeated and unwanted" contact with another person, thereby causing that person to be alarmed or coerced.[3] The contact may consist of, among other things, coming into the person's visual or physical presence, following the person, waiting outside the person's home, property, place of work or school, or sending or making written communication of any kind. *See* ORS 163.730(3) (defining "contact" for both criminal and civil stalking statutes). Additionally, it must be objectively reasonable for the contacted person to have been alarmed or coerced by the contact. ORS 30.866(1)(b); *see also Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000) (discussing subjective and objective components). Finally, the contact must also cause the contacted person reasonable apprehension regarding his or her personal safety. ORS 30.866(1)(c).

---

[1] In this opinion, all references to respondent are to appellant Wood and all references to petitioner are to respondent on appeal, Hollon. We explained in *Hanzo v. deParrie*, 152 Or App 525, 527 n 1, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999):

"In civil stalking proceedings, the party applying for relief is denominated the 'petitioner' and the party against whom the relief is sought is the 'respondent.' Obviously, that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant and the 'petitioner' below is the respondent. Nevertheless, for consistency and in accordance with our own rules governing designation of parties in briefs, ORAP 5.15, all references to 'respondent' are to deParrie and all references to 'petitioner' are to Hanzo."

[2] Respondent raises two assignments of error. Because of our disposition of the first assignment of error, we do not reach the second one.

[3] "Alarm," for purposes of the issuance of an SPO, means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Coerce" means "to restrain, compel or dominate by force or threat." ORS 163.730(2).

■    Thus, the statute has both subjective and objective components. The contacted person must in fact be alarmed by the contacts, and those specific contacts must cause the person apprehension regarding his or her personal safety. In other words, there must be "a causal relationship between the contact and the alarm or coercion felt by the other person—*the alarm or coercion must arise from the contact.*" *Schiffner v. Banks*, 177 Or App 86, 92, 33 P3d 701 (2001) (emphasis added). Moreover, the contacted person's alarm must be objectively reasonable. ORS 30.866(1)(b).

In brief, the pertinent facts are these. Respondent began dating Mike Jones in 1997. Although the two were not married or in a committed relationship, they shared expenses and jointly owned certain property. Additionally, their houses were located on adjoining property and, at one point in time, Jones's mother lived with respondent. In October 2003, Jones began "dabbling in internet affairs." Through the Internet, he met petitioner, and the two began dating. Jones continued his relationship with respondent. Although respondent was aware of petitioner's relationship with Jones, it is not clear that petitioner was aware that Jones and respondent remained intimately, as well as financially, involved.[4]

According to petitioner, once she began dating Jones, she experienced a number of unwanted contacts by respondent. Those contacts fell into two categories: those that involved expressive verbal communications, either on the phone or in person, and those that involved forms of nonexpressive contact. Petitioner described the expressive verbal contacts as generally involving communications about the tangled nature (financial and otherwise) of respondent's and petitioner's relationships with Jones. The nonexpressive contacts typically involved respondent's conduct as petitioner drove to or from Jones's home, passing close to respondent's adjacent home along the way.

■ ■    On appeal, respondent argues that the contacts involving expression fail to meet the more exacting standard required of such contacts to avoid constitutional problems.

---

[4] Jones was not present to testify at the hearing.

*See Castro*, 194 Or App at 13. The fact that expressive contacts, to support an SPO, must meet a more exacting standard is well-settled: "[T]o avoid constitutional overbreadth problems, [expressive] contacts must meet a more stringent standard than the one set out in the statute." *Id.* (citing *State v. Rangel*, 328 Or 294, 300, 977 P2d 379 (1999)). That more stringent standard requires that the contacted person prove that the expressive contacts involved threats that " 'instill[ ] in the addressee a fear of imminent and serious personal violence from the speaker, [are] unequivocal, and [are] objectively likely to be followed by unlawful acts.' " *Id.* (brackets in original) (quoting *Rangel*, 328 Or at 303).

On *de novo* review, we agree that the expressive contacts on which petitioner relies fail to satisfy that standard. By our count, there were three such contacts. The first two involved telephone calls that respondent made to petitioner that petitioner claims caused her to feel threatened. The first occurred when respondent left a "cryptic" voicemail message on petitioner's cell phone sometime in January 2004. Petitioner returned that phone call. At the hearing, she testified that her recollection of the ensuing phone conversation was that respondent had told her "to leave [Jones] alone, blah blah blah blah blah." Petitioner provided no additional details about that call. Nor did petitioner connect that specific conversation to any specific reaction on her part except to assert that she wrote a letter asking respondent not to contact her again. The fact that petitioner wrote the "no contact" letter is the only basis in the record to infer that the cryptic message and ensuing phone conversation caused petitioner fear of imminent and serious personal violence. But that inference is defeated by petitioner's own testimony about what happened after she wrote that letter. In particular, she acknowledged that she was not "prepared to follow through on [that] letter"—*i.e.*, by filing the SPO to preclude any contact between petitioner and respondent—until about eight months later, at which point there had been additional contacts between petitioner and respondent. Under the circumstances, we cannot find on this record that the first expressive contact on which petitioner relies satisfies the requisite heightened standard for expressive contacts that will support the issuance of an SPO.

The second telephone contact on which petitioner relies occurred sometime in March 2004. Thus, by petitioner's own account, that contact also occurred well before petitioner was "prepared to follow through on [her] letter." That fact, under these circumstances, strongly suggests that petitioner was not placed in fear of imminent and serious personal violence by that telephone contact. Nor do we draw any such inference from the nature of the telephone contact or petitioner's description of her reaction to it. Petitioner testified only that there was a second telephone contact of some kind. She provided no details of the conversation, except to assert in vague terms that respondent was angry. Petitioner responded to the call by changing her telephone numbers, stating that she was "tired of being harassed." We can assume from that reaction that petitioner was annoyed and had no patience with further telephone contacts. But her testimony as a whole fails to provide a convincing basis to infer that the second telephone contact caused her to be in fear of imminent and serious personal violence.[5]

The final expressive contact that petitioner relies on is an incident in which respondent approached petitioner while she was seated in a parked car and allegedly began yelling at her. According to petitioner, respondent yelled at her, through the car window, that they "would talk, that [they] would straighten things out." Again, as with the first two telephone contacts, petitioner provided no further details about the exchange. Nor did she identify in any specific terms whether she feared imminent and serious physical violence as a result of respondent's confrontational behavior and, if so, why.

We conclude that the expressive contacts on which petitioner relies—alone or in combination—fail both the subjective and objective prongs of the heightened standard. Petitioner did not describe any of the expressive contacts as instilling in her a fear of imminent personal violence. The nature of the contacts, together with petitioner's sometimes

---

[5] Petitioner's testimony that she changed her telephone numbers because she was "tired of being harassed" suggests there may have been other telephone contacts as well, but petitioner specifically identified only the two that we have discussed.

ambivalent reactions to them (*i.e.*, her disinclination to follow through on her no contact letter until almost eight months after she sent it), do not give us a convincing basis to infer that the contacts caused petitioner to fear for her personal safety. Finally, petitioner's descriptions of the expressive contacts were too vague and generalized to lead us to conclude that it was objectively likely that any threats implicit in respondent's communications would be followed by unlawful acts. *See id.* Accordingly, petitioner has not met her burden with respect to the stringent standard required for expressive contacts.[6]

We turn, then, to the second category of contacts— *i.e.*, the nonexpressive contacts involving respondent's driving. Petitioner presented evidence of, at most, one nonexpressive contact in which respondent followed petitioner too closely while both drove their respective cars down the one-lane gravel road that leads to respondent's and Jones's houses. In other words, respondent "tailgated" petitioner. Respondent argues that, even assuming that this one contact meets the statutory standard, it alone is insufficient to support an SPO. We agree. The statute calls for repeated contacts and defines "repeated" as "two or more." ORS 163.730(7). Accordingly, the statutory standard for repeated unwanted contacts was not satisfied. Therefore, on *de novo* review, we conclude that the SPO should not have issued.

Reversed.

---

[6] Petitioner presented evidence of one or two other incidents in which respondent allegedly made "hand gestures * * * or * * * verbal comments," or in which respondent would allegedly drive slowly and either "yell" or "stare at" petitioner. None of those allegations was described in any further detail, and it is not clear, based on petitioner's own testimony, that petitioner directly relied on them as a basis for issuance of the SPO. In petitioner's own words, those contacts led petitioner at most to feel "uncomfortable." In all events, on *de novo* review, we are not satisfied that petitioner sufficiently demonstrated the "causal relationship between the contact and the alarm or coercion felt," *Schiffner*, 177 Or App at 92, or that any alarm petitioner may have felt was objectively reasonable, ORS 30.866(1)(b). Thus, apart from the burden that applies to expressive contacts, petitioner failed to meet her statutory burden. We therefore do not consider those particular contacts further.