Argued and submitted December 22, 2009, in case number A138098, convictions for violating stalking order reversed and remanded with instructions to enter judgment of conviction for one count of violating stalking order reflecting defendant's conviction on all three theories; remanded for resentencing; otherwise affirmed; in case number A138097, conviction reversed August 18, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JEFFREY MARTIN SIERZEGA,
aka Jeffrey Sierzega,
*Defendant-Appellant.*

Marion County Circuit Court
07C22269, 07C41538;
A138097 (Control), A138098

237 P3d 234

Kenneth A. Kreuscher, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Denis M. Vannier, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

BREWER, C. J.

* Brewer, C. J., *vice* Edmonds, P. J.

**BREWER, C. J.**

This is an appeal from judgments in two consolidated cases, one involving multiple counts of violation of a stalking protective order (SPO) (case number A138098), and the other involving a conviction for stalking relating to a different victim (case number A138097). In the first case, we accept the state's concession that the trial court plainly erred by failing to merge defendant's three separate convictions for the offense of violating a single SPO, when those convictions were based on different theories of guilt arising from a single telephone call to one person. We exercise our discretion to review defendant's challenge as plain error and remand that case for resentencing and imposition of a single conviction for violating a stalking protective order. *See State v. Ascencio-Galindo*, 220 Or App 600, 188 P3d 392, *rev den*, 345 Or 175 (2008) (reviewing as plain error and correcting trial court's improper failure to merge two convictions where multiple counts represented different theories of guilt for the same criminal act).

■ In the second case, defendant asserts that the trial court erred by denying his motion for a judgment of acquittal because, among other reasons, the charged contacts involved expression protected under Article I, section 8, of the Oregon Constitution. In reviewing a trial court's denial of a motion for a judgment of acquittal, we consider whether any rational trier of fact, accepting reasonable inferences and making reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). In so doing, we review the facts in the light most favorable to the state and draw all reasonable inferences in the state's favor. *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). As explained below, we reverse.

The alleged victim, A, worked in the Marion County Courthouse. She became acquainted with defendant because he would frequently purchase copies of legal documents from the court's records. That acquaintance was restricted to court business, and it occurred during the summer of 2005. Defendant would tell A that he needed to pay for copies with a quarter; A would give him a receipt, and defendant would

leave. Defendant did this once every day for about one month and was then reassigned to work as a clerk for a judge. At the end of October 2006, A again encountered defendant, when A was clerking in a courtroom where defendant had a hearing. Defendant did not directly speak with A. However, he "gasped" and made "a little wave" when he saw her. Defendant kept glancing at A throughout the hearing. A felt uncomfortable because she could not understand why defendant gasped when he saw her.

Soon after the hearing, defendant called the judge's chambers to find out who worked in that office. A told him who worked there, and defendant hung up. A recognized defendant's voice. A felt nervous and foolish for having given her name to the caller. A few days later, A received a handwritten but anonymous letter. The letter read, "[A], I was afraid I was never going to see you again." A felt alarmed because she was unsure from whom the letter had come. A suspected defendant and was upset because the letter addressed her by a nickname that only her family used. She felt that it was "way too personal of a communication to have."

A then learned that defendant had made telephone calls to various people trying to locate members of A's family and obtain pictures of them. In particular, defendant was trying to get pictures of A's father, who worked for the sheriff's department at the courthouse. Defendant thought that A's father was "tracking him through some unmanned space crafts [and through] some filling in a tooth." Defendant also called A's sister at work to try to get some information, claiming that he was a former teammate of her father on his high school wrestling team. The next day, A cried and broke out in hives because she was nervous about defendant being in the courthouse, and she did not want defendant to know where she was.

Ultimately, A spoke to a detective in the Keizer Police Department and asked him to tell defendant to leave her alone. The detective spoke to defendant in the Marion County Law Library. The detective talked to defendant about

his contacts with A and defendant's efforts to gather information about A's father. Defendant denied sending any correspondence to A, but he admitted that he had tried to obtain photographs of A's father to present to the district attorney's office; defendant stated his belief that the sheriff's office had a secret unmanned space ship program and was observing him at night. Defendant also claimed that he had ocular implants in his eyes, and he became increasingly agitated as the conversation progressed. The detective told defendant that A and her father did not want to have further contact with him, that A was frightened by the contacts, and that, if defendant persisted in his behavior, he might be guilty of the crime of stalking. The detective told defendant that he could continue to use the courthouse if he behaved appropriately.

Defendant then wrote a fax to the judge for whom A was clerking, in which defendant sought permission to continue contacting the judge, who was presiding over an unrelated civil action to which defendant was a party. Defendant reported to the judge that the detective had instructed defendant not to contact A.

Several weeks later, in January 2007, A was working as a clerk in a different judge's office. She was working at a desk in the anteroom of that judge's chambers. A heard someone speak to her and ask, "[A], is [a third judge] in her office?" A looked up and saw defendant standing at the door. A replied, "This isn't the [third judge's] office" and grabbed her keys and ran into the interior office. The third judge's office was one floor above the second judge's office. A was very frightened. Another police officer spoke to defendant about his behavior, and defendant told the officer that he did not believe that the Keizer police officer "had the authority to tell him to stay away from [A]."

A then transferred to the court's civil department. After several months, defendant began calling that office and asking who worked there. Defendant also asked who worked for the second judge; when he was told that A no longer worked there, defendant hung up. Soon thereafter, in November 2007, A received a fax at her office, which read:

"[A] will you marry me? I'm still in love with you, and I guess I always will be. I promise I won't try to call [your

father] 'dad.' I'm not crazy about your father, but you are just too bad!

> "Gimme some sugar [A], I need it."

The suggestive tone of the fax frightened A, who believed that it came from defendant.

Defendant subsequently telephoned the courthouse several times to ask if A had received the fax. The next day, defendant called the records department of the court and asked "who was in civil that day." The clerk who answered the phone told A that defendant was on the phone. A took the phone and transferred the call to the sheriff's department without saying anything to defendant.

After the evidentiary phase of the trial was concluded, defendant moved for a judgment of acquittal on the ground that there was insufficient evidence that he had engaged in repeated and unwanted contacts with A that were not constitutionally protected expression. The trial court denied the motion, and a jury found defendant guilty of the crime of stalking. The court sentenced defendant to probation with general and special conditions. On appeal, defendant challenges the denial of his motion for a judgment of acquittal.

The essential elements of the crime of stalking are set out in ORS 163.732, which provides, in part:

"(1)  A person commits the crime of stalking if:

"(a)  The person knowingly alarms or coerces another person or a member of that person's immediate family or household by engaging in repeated and unwanted contact with the other person;

"(b)  It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)  The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

A person may be convicted of stalking when that person knowingly alarms or coerces another person by making repeated and unwanted contacts with that person. ORS 163.732(1)(a). The contact may consist of, among other things, speaking to the other person, or sending or making written communications of any kind to the other person. ORS 163.730(3)(d), (e). Additionally, the state must prove that A was, in fact, alarmed or coerced as a result of the repeated and unwanted contacts and that A's apprehension about personal safety was objectively reasonable.

Because "contact" as used in ORS 163.732(1)(a) may include writing or speech, the Supreme Court explained in *State v. Rangel*, 328 Or 294, 301, 977 P2d 379 (1999), that ORS 163.732 restricts expression, at least in part. A statute that reaches expression privileged under Article I, section 8, of the Oregon Constitution is overbroad. The court in *Rangel* concluded that ORS 163.732 is not overbroad, however, because the phrase "knowingly alarms or coerces" limits any punishable expression to expression that consists of unambiguous, unequivocal communications, specific to the addressee, that instill in the addressee a fear of imminent and serious personal violence from the speaker and that are objectively likely to be followed by unlawful acts. *Rangel*, 328 Or at 303-06.

In this case, the state charged defendant with "engaging in repeated and unwanted contact" with A. At trial, the prosecutor primarily relied on three contacts: (1) the letter that defendant sent to A after the hearing in late October 2006; (2) the unannounced in-person incident in January 2007 where defendant approached A in the antechamber of the judge's office where she was working; and (3) the fax that defendant sent to A in November 2007. Defendant argues that all three contacts constituted communication that is protected under *Rangel*. According to defendant, none of those communications included a qualifying threat to A; as defendant sees things, even his fax, although "creepy," did not convey an intent and ability to violently harm A. At a minimum, defendant reasons, even if the face-to-face encounter was a qualifying unwanted contact, the letter and the fax constituted expression under *Rangel* and, because they did not contain qualifying threats, the state failed to satisfy the

requirement of "repeated and unwanted" contacts under ORS 163.732.

On appeal, the state relies on three additional sets of contacts as support for the denial of defendant's motion for a judgment of acquittal, namely, (4) defendant's multiple visits during the summer of 2005 to the court clerk's office in which he requested copies of documents from A; (5) defendant's call to the judge's office in late 2006 in which he hung up after asking A who worked there; and (6) defendant's call to the court records office in late 2007, in which the person who answered the phone called A to the phone and she, in turn, transferred the call to the sheriff's department. The state concedes that the fourth set of contacts, which actually occurred first in time, is relevant only as context for ensuing contacts, because the record does not show that the contacts were "unwanted." The state also concedes that none of the six posited contacts amounted to threats of "imminent and serious personal violence" under *Rangel*. The question thus reduces to whether at least two of the five contacts upon which the state relies as unwanted contacts satisfied the statutory requirements and, in addition, were not of "a purely communicative nature." *Wood v. Trow*, 228 Or App 600, 605, 208 P3d 1030 (2009).

■     We disagree with defendant's assertion that his face-to-face contact with A in the judge's antechamber in January 2007 was of a purely communicative nature. There was evidence from which the jury could find that defendant was romantically obsessed with A and that he knowingly sought her out on the pretext of inquiring about the chambers of a judge that were located on a different floor of the courthouse. Such a contact is not purely communicative so as to import the additional requirement of a qualifying threat under *Rangel. See Castro v. Heinzman*, 194 Or App 7, 14-15, 92 P3d 758 (2004) (physically approaching petitioner was a nonexpressive contact even though respondent also spoke to petitioner); *see also State v. Maxwell*, 165 Or App 467, 475-76, 998 P2d 680 (2000), *rev den*, 334 Or 632 (2002) (even if it includes communication, coming within A's physical presence can be a qualifying contact that is not purely communicative). Defendant does not assert that that conduct otherwise failed to satisfy the statutory requirements. There was

evidence that it was unwanted, that it alarmed A and, based on defendant's conduct up to and including that contact, a trier of fact could find that it was objectively reasonable for A to be apprehensive about her personal safety.

■ The question remains whether any of the other contacts upon which the state relies constituted a qualifying unwanted contact. The state essentially concedes that, apart from their contextual value, neither the letter that defendant wrote in late 2006, nor the fax that defendant sent in November 2007, included nonexpressive conduct. We agree. *See, e.g., Wood,* 228 Or App at 605-06 (concluding that a "greeting card in which respondent speaks of a romantic relationship" with the petitioner and telephone messages in which he told the petitioner that "he would like to get together with her" were of a "communicative nature" under *Rangel*). Accordingly, those two communications were not actionable contacts because they did not satisfy the threat requirement under *Rangel*.

■ The state argues, however, that there was evidence that defendant initiated the 2006 call to the judge's chambers in which defendant hung up after asking A who worked there as a pretext for merely having A on the line. As such, the state urges, the contact was not communicative under *Rangel*. We disagree. A "hang up" call in which the caller is silent is not an expressive contact. *See State v. Shields,* 184 Or App 505, 510, 56 P3d 937 (2002), *rev den,* 335 Or 355 (2003) (so holding). However, a telephone conversation, such as the one that occurred here, is of a communicative nature. *See Wood,* 228 Or App at 605 (telephone voicemail message was expressive communication); *see also Hollon v. Wood,* 204 Or App 344, 348, 129 P3d 709 (2006) (determining that telephone conversations were expressive and must satisfy *Rangel* threat requirements). Because defendant made no threat in the call, it was not a prohibited contact under *Rangel*. Moreover, that call occurred before defendant had been warned against contacting A by the police. Although A felt foolish for giving her name to defendant during the call, and the call raised a "red flag" for A, there was no evidence that she was actually alarmed or that it would have been objectively reasonable for her to fear for her personal safety as a result of that contact. In short, apart from its evidentiary

value as context for establishing that other contacts satisfied the statutory requirements, the 2006 phone call did not, by itself, constitute a qualifying forbidden contact.

■ The final posited contact was the call that defendant made to the court records office in late 2007. Although that call occurred at a point in defendant's history of unwelcome interactions with A when A was afraid of having any contact with defendant, it is also problematic under the *Rangel* test. In the first place, there is no evidence that defendant attempted to contact A in making that call; he called the records office, and she worked in the civil department. Second, A voluntarily came to the telephone, despite the fact that defendant had not asked for her. Thus, there is no evidence that defendant actually contacted A in that incident. What is more, the call was expressive communication, and it did not include a threat under *Rangel*. Accordingly, that call did not qualify as a prohibited contact.

In sum, on the record in this case, a trier of fact could have found that defendant made a single unwanted contact with A that included nonexpressive conduct that alarmed A and instilled in her a reasonable apprehension for her personal safety. The remaining contacts on which the state relies, however, did not qualify as *repeated* unlawful contacts for the reasons set out above. Accordingly, the trial court erred in denying defendant's motion for a judgment of acquittal.

This case is particularly disturbing, because the evidence showed that defendant is mentally unstable and romantically obsessed with A to the point of disregarding reasonable requests by law enforcement officials that he leave A alone. The difficulty is that, in the absence of a qualifying threat, defendant's communications with A did not cross the threshold beyond which expression loses its constitutional protection.

In case number A138098, convictions for violating stalking order reversed and remanded with instructions to enter judgment of conviction for one count of violating stalking order reflecting defendant's conviction on all three theories; remanded for resentencing; otherwise affirmed. In case number A138097, conviction reversed.