Argued and submitted March 9, reversed April 26, 2006

Heidi Kirsten COURTEMANCHE,
*Respondent,*

*v.*

Donald Ray MILLIGAN,
*Appellant.*

18-05-08867; A128521

134 P3d 999

Bryan T. Hodges, Judge.

Jeffrey E. Potter argued the cause for appellant. With him on the briefs was Gardner, Honsowetz, Potter, Budge & Ford.

James C. Jagger argued the cause for respondent. With him on the briefs was James C. Jagger, P.C.

Before Haselton, Presiding Judge, and Armstrong and Ortega, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Respondent, a mail carrier, appeals, challenging a permanent stalking protective order (SPO) obtained by petitioner, whose residence is on respondent's mail delivery route.[1] On *de novo* review, *Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999), we determine that respondent's contacts with petitioner did not warrant the issuance of an SPO. In particular, petitioner failed to prove that respondent engaged in repeated contacts with petitioner either knowing that those contacts were "unwanted" or with an "aware[ness] of a substantial and unjustifiable risk that the contacts in question [were] * * * unwanted by the recipient[.]" *Delgado v. Souders*, 334 Or 122, 133, 46 P3d 729 (2002). Accordingly, we reverse.[2]

We find the material facts (which are largely undisputed) to be as follows: At all material times, respondent was a letter carrier for the United States Postal Service. Respondent's mail delivery route included the North Coburg Road area of Eugene, where petitioner lived with her husband and children. Respondent first met petitioner in approximately 1999, while delivering mail.

In approximately the fall of 2003—roughly 18 months before petitioner applied for the SPO—respondent, while delivering mail, encountered petitioner, who was working in her front yard. They "started just talking," and, when petitioner mentioned that her "joints [were] aching," respondent replied that he had been taking calcium supplements that made him feel "so young * * * that he even sun bathed in the nude." Not surprisingly, petitioner regarded that gratuitous reference to be entirely inappropriate. However, she

---

[1] In civil stalking proceedings, the party applying for relief is denominated the "petitioner" and the party against whom relief is sought is the "respondent." That nomenclature can be confusing in an appeal like this, where the "respondent" below is the appellant, and the "petitioner" below is the respondent. Nevertheless, in accordance with our own rules governing the designation of parties in briefs, ORAP 5.15, we refer to the parties by their designation in the trial court.

[2] Given our analysis and disposition, sustaining respondent's third assignment of error, we do not address respondent's other assignments of error. We also do not address other aspects of the third assignment of error, which challenge the sufficiency of other aspects of petitioner's proof.

said nothing to respondent; instead, petitioner "cut the conversation short," went inside, and "just kind of blew it off."

Thereafter, "every now and then, off and on," respondent would bring parcel postage due notices with the parcels to petitioner's front door. Petitioner viewed that conduct as unnecessary, apparently because she believed that such notices could have been left in the mailbox, but there is no evidence that she ever so informed respondent.

Beginning a few months before she applied for the SPO, petitioner would notice respondent in his mail truck "doing the mail," while parked near her daughter's school bus stop in the afternoon. As petitioner and her son waited for her daughter, respondent would come over (in petitioner's description) "just for small talk." Again, there is no evidence that petitioner ever indicated to respondent that those conversations were unwelcome.

On one such occasion, as petitioner was waiting for her daughter, respondent (again, in petitioner's description) "kind of jokingly jumped out" from behind a nearby large rhododendron bush and wished her a happy birthday. Petitioner thought that "strange because—how did he know it was my birthday?" Respondent replied that he could tell from the nature of petitioner's mail—"cards and things like that, and that he had even put a happy face on one of [petitioner's] letters and hoped that that was okay." Again, there is no evidence that petitioner indicated to respondent that that conduct was unwelcome.

On another occasion, apparently at about the same time, respondent told petitioner that he could see her backyard and into her house from the street behind her house. That comment "struck [petitioner as] funny" because she had been unaware that her house could be seen from that street.

At different times, petitioner would see respondent at other locations, "at the salon * * * around town, at Costco, just where his route is and everything." They would engage in "small talk." Petitioner "just kind of just let that slide, because I don't like confrontation[.]"

During one of those conversations, respondent and petitioner spoke about respondent's upcoming vacation, in

April 2005, to Cabo San Lucas. Petitioner told respondent to "let [her] know how that trip goes" because her parents vacationed nearby.[3] During the same conversation, respondent also spoke with petitioner about problems that he was having with his girlfriend. Petitioner did not discuss the substance of those problems but did respond that "it's nice to talk about those problems with people."

Respondent returned from his Mexican vacation on April 22, 2005. On April 25, between approximately 9:15 a.m. and 7:20 p.m., respondent called petitioner's home eight times. There is no indication in the record that he had ever called petitioner's home before. With respect to the first three calls, petitioner did not answer, and respondent did not leave a message; rather, petitioner merely noted the name "Donald Milligan" (which she did not recognize) on caller identification. On the fourth call, early in the afternoon, respondent left a message identifying himself as "Don at Don's Plumbing" and asked petitioner to call him, leaving his telephone number. Petitioner heard the message and—after finding no listing for "Don's Plumbing" (she had never heard of "Don's Plumbing")—realized "that sounds like our mailman[.]"

Shortly thereafter, when petitioner went to pick up her daughter at the bus stop, respondent, who was still on vacation, was waiting and "wave[d] [her] down." Petitioner could not initially see who it was, but, when she realized that it was respondent, she "just instantly felt sick to [her] stomach." Respondent and petitioner spoke, and, during their brief conversation, respondent remarked, "I heard Don's Plumbing called." Petitioner said that she was running late to pick up her daughter, and respondent replied, "[W]ell, give me a call."[4] Petitioner said nothing about the telephone calls.

Respondent called four more times that afternoon and evening, apparently leaving no messages. When the last call occurred, petitioner's husband was at home, and, when he picked up the telephone, respondent hung up. Petitioner

---

[3] Petitioner gave contradictory testimony on this point. We view as more credible petitioner's initial account on cross-examination, which comports with respondent's account.

[4] According to respondent, the "Don's Plumbing" reference was a "joke" because he actually is a plumber.

and her husband then called respondent to tell him "to leave us alone," but respondent did not answer.

The next day, petitioner's husband called respondent—and respondent, after initially denying having made the calls, admitted that he had done so. Petitioner's husband told respondent never to call petitioner again, that he was "scaring [petitioner] very much" and needed to leave her alone. Respondent had no further contacts with petitioner.

Petitioner executed a uniform stalking complaint, ORS 163.744, on April 30, 2005. On May 5, 2005, the court entered a permanent SPO.

■　　ORS 163.738(2)(a)(B) provides that a court may enter a stalking protective order if

"(i)　The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii)　It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii)　The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

When the unwanted contacts involve speech, the contacts must be the sort that "instill[ ] in the addressee a fear of imminent and serious personal violence from the speaker, [are] unequivocal, and [are] objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999).

■　　Further, as particularly pertinent here, a respondent "must act intentionally, knowingly, or recklessly respecting the * * * unwanted nature of the contacts in question." *Delgado*, 334 Or at 132. Thus, petitioner must establish that, on at least two occasions, respondent "subjectively [was] aware of a substantial and unjustifiable risk that the contacts in question [were] * * * unwanted by the recipient, and

then consciously and unreasonably disregard[ed] that risk." *Id.* at 133.

■        Here, petitioner failed to make that requisite showing. We do not, of course, condone respondent's conduct. That conduct was persistent to the point of being obsessive—and, in some instances, can be most charitably characterized as strange, boorish, and offensive. Nevertheless, viewing the parties' contacts in the context of the totality of their interactions, we cannot find that respondent subjectively knew that two or more of those contacts were unwanted or that he was aware of a "substantial and unjustifiable risk" that the contacts were unwanted but "consciously and unreasonably disregard[ed] that risk." *Delgado*, 334 Or at 133.

In this case, unlike in many stalking cases,[5] petitioner never told respondent that further contact was unwanted. Or, rather, that did not occur until petitioner's husband called respondent—and respondent never contacted petitioner again. That, of course, is not conclusive; nor is an SPO petitioner required to object to an unwanted contact. Rather, an SPO respondent's culpable mental state can be circumstantially established through other, less explicit, evidence. *See, e.g.*, *Delgado*, 334 Or at 137-38 (where the respondent and the petitioner were strangers, the respondent's physical movements in close proximity to the petitioner in deserted areas, coupled with his furtive "side glances" in her direction and his pattern of appearing in the petitioner's presence "on numerous occasions in the preceding months," were sufficient to establish the respondent's awareness that his "repeated presence was unwanted").

Here, neither the circumstances nor the content of the parties' interactions establishes respondent's subjective awareness that at least two of the contacts were unwanted.

---

[5] *See, e.g.*, *Castro v. Heinzman*, 194 Or App 7, 10-11, 92 P3d 758 (2004) (after the petitioner had told the respondent that she "did not want to ever see him again [or] hear from him[,]" the respondent sent a "barrage" of e-mails to the petitioner and left "numerous telephone messages" for her, with those communications being "replete with respondent's proclamations of love and devotion to petitioner") (first brackets in original); *accord Bryant v. Walker*, 190 Or App 253, 257, 78 P3d 148 (2003), *rev dismissed*, 337 Or 585 (2004) (although the fact that the petitioner "told [the respondent] to stop staring at her, does not conclusively establish that he *knew* that further contact would be unwanted, the exchange was surely sufficient to make him aware of a substantial risk that further contact was unwanted" (emphasis in original)).

The "nude sunbathing" remark, although gratuitous and offensive, occurred in the context of an innocuous "small talk" conversation—which, in turn, was part of a continuing course of such conversations between the parties. Petitioner said nothing about it, and the parties continued to interact, as before, at least ostensibly in a mutually agreeable manner. Further, there is nothing in the encounters on petitioner's birthday, at the bus stop, or at other locations on respondent's delivery route that shows that respondent was aware that any of those contacts was unwanted or presented a "substantial and unjustifiable risk" that petitioner so regarded them.

Finally, petitioner points to the multiple telephone calls and the in-person encounter on April 25, the last day that respondent had any contact with petitioner. The content of those contacts—with the exception of the strange "Don's Plumbing" reference—was innocuous. To be sure, the potentially (and, for petitioner, actually) disturbing feature was respondent's use of the telephone for the first time, escalating the intrusion into petitioner's life. Still—and again—our inquiry is not whether an objectively reasonable person would have understood that such an intrusion was unwelcome; rather, it is whether respondent subjectively had that awareness or acted recklessly, in conscious disregard of a "substantial and unjustifiable risk" that his calls would be unwelcome.

We cannot so find. Petitioner had never suggested to respondent that any of his behavior was unwelcome or inappropriate. All of their prior interactions had, ostensibly, been friendly and mutually agreeable. The actual content of the telephone message that respondent left was neither offensive nor threatening; and, even when respondent and petitioner spoke on the afternoon of April 25, after petitioner had received the "Don's Plumbing" call, petitioner said nothing about that call. Further, and tellingly, when petitioner's husband *did* tell respondent that his contacts with petitioner were unwanted and that he must end them, respondent did so, immediately. Given those circumstances, we conclude that petitioner failed to prove that respondent acted with the requisite mental state. ORS 163.738(2)(a)(B).

Reversed.