Argued and submitted March 10, affirmed September 27, 2006

Meghan Christine HABRAT,
*Respondent,*

*v.*

Donald Ray MILLIGAN,
*Appellant.*

18-05-08866; A128520

145 P3d 180

Jeffrey E. Potter argued the cause for appellant. With him on the briefs was Gardner, Honsowetz, Potter, Budge & Ford.

James C. Jagger argued the cause for respondent. With him on the brief was James C. Jagger, P.C.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge,* and Linder, Judge.

LINDER, J.

---

* Brewer, C. J., *vice* Wollheim, J.

## LINDER, J.

The trial court granted petitioner a permanent stalking protective order (SPO) against respondent.[1] Respondent appeals, challenging, among other issues, the adequacy of the evidence to support the issuance of the SPO. We affirm.

We review the facts *de novo. Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999). We defer to the trial court's implicit and explicit credibility determinations, which favored petitioner. Therefore, we rely primarily on petitioner's testimony in relating the facts, but we note some of the conflicting testimony that respondent gave, because those contradictions further inform our view of the evidence.

Petitioner is a hair stylist at a salon in a small shopping center. Respondent is a mail carrier for the United States Postal Service. Respondent and petitioner met because respondent's assigned mail route included delivering mail to the salon where petitioner works. About a year and a half before petitioner sought the SPO, respondent went to the receptionist at the salon and asked for an appointment for petitioner to cut his hair. Petitioner cut respondent's hair on that occasion and a few more times—perhaps four—after that.

As petitioner cuts a client's hair, she usually engages in general "chit-chat" or other small talk with the client. Mostly, petitioner talks about her husband and two children. When petitioner began cutting respondent's hair, respondent initially discussed his work, his sons, and his previous jobs. But he soon became sexually solicitous in a way that made petitioner very uncomfortable. In particular, even though he knew that petitioner was married and had children, respondent asked petitioner to go out with him. When petitioner turned him down and asked if he was kidding, he told her it was "worth a shot" to see if she would accept. Respondent persisted in his overtures in other ways. For example,

---

[1] In accordance with ORAP 5.15, we refer to the parties by their designation in the trial court. Those designations can be confusing, because the "respondent" below is the appellant in this case, and the "petitioner" below is the respondent. Nevertheless, we adhere to the convention of our rule.

respondent commented on petitioner's looks, telling her how pretty she was, asking her if she had been a model, and making similar observations about her appearance. He was even directive about how he wanted petitioner to look, saying such things as "I want you to wear that short little skirt I like so much."

Petitioner also learned that respondent may have fabricated stories about petitioner to his girlfriend. At some point after petitioner began cutting respondent's hair, his girlfriend called petitioner. The girlfriend accused petitioner of having an affair with respondent. Petitioner denied it, and she and the girlfriend talked. When the conversation ended, the girlfriend urged petitioner not to tell respondent that she had called, because the girlfriend feared that respondent would hurt her.

Respondent did other things that caused petitioner to be uncomfortable and concerned about the attention that respondent directed toward her. In particular, after he had delivered the salon's mail and had left to continue his mail route, respondent began returning and parking his truck in front of the salon for extended periods of time. Sometimes he would remain there until the end of his shift at 5:00 p.m. Respondent told petitioner that, when he finished his route, he had "nothing better to do." To petitioner, it seemed that respondent was sometimes parking in front of the salon for hours at a time. He usually parked either in a place designed for disabled parking only or in another space directly in front of the salon. Sometimes, he parked within a car's distance of petitioner's vehicle or in a gravel area next to the paved parking and in view from the salon. Sometimes, respondent backed into the parking spot and watched petitioner through his rearview mirror. To petitioner, the ways in which respondent parked and positioned his mail truck seemed to be an effort to antagonize her by indicating, "[L]ook, I'm here. Here I am."

Respondent's sexual overtures and behavior made petitioner wary, uncomfortable, and concerned. She was not alone—her coworkers became concerned for her as well. They began to warn petitioner to be careful. Petitioner's discomfort increased. She worked evenings and began to feel so wary

about going out to her car alone that she either had someone walk her to her car or watch her while she walked alone.

Finally, one of petitioner's coworkers took matters into her own hands after respondent approached petitioner with a coupon for a free cup of coffee and presented it to her as a "Valentine's Day" gift. Petitioner and her coworkers considered the gift totally inappropriate. The coworker, out of concern and a desire to protect petitioner, complained about respondent to the local post office.

After the complaint, respondent's behavior changed. He stopped coming in for haircuts and stopped having direct contact with petitioner. Respondent continued to deliver the mail to the salon but said nothing to petitioner when he did so. Instead, he "would glare" at her in a way that she described as "very menacingly." Although respondent continued to park his mail truck in front of the salon, he no longer did so for long or extended periods of time. His longest stays lasted about 45 minutes. Still, the fact that respondent continued to return to park in front of the salon continued to concern petitioner, enough so that family members (her parents) advised the post office about it. The post office, in turn, asked petitioner to keep a log of the dates, time, and durations of respondent's parking activities.

That state of affairs continued for about six months after the coworker's first complaint to the postal service. Then, respondent initiated renewed contact with petitioner three times, after which petitioner sought an SPO.

The first renewed contact occurred on a warm day, when petitioner was driving in her car alone with the window partially down. Respondent saw her driving toward him and tried to flag her over. They both slowed. Petitioner was alone, unlike the other settings in which respondent had previously had contact with petitioner. Through petitioner's open car window, respondent called to her and tried to get her to pull over and stop so that he could "talk to [her]." She told him "absolutely not" and drove on.

A second renewed contact occurred while petitioner was outside the salon, taking a break in the warm sunshine with other coworkers. Respondent again parked in the gravel

area near the salon. Petitioner, who apparently was seated on the ground, rested her head on her knees to avert her eyes and avoid any eye contact with respondent. She heard his footsteps on the gravel, and he approached her, greeting her as "smiley." When she responded, "what!," he accused her of being "grumpy" and left. But he did not turn to leave. Instead, he backed away, holding eye contact with her. She was forced to break his stare by putting her head down and resting it on her knees. She wanted to go inside immediately, but did not want him to believe he had succeeded in intimidating her. After about two minutes, she was so unnerved from the contact that she went inside anyway.

The third, and final, renewed contact by respondent occurred near the end of petitioner's shift one evening. Respondent did not have an appointment for a haircut, but he came in insisting that petitioner give him one. He directed petitioner: "[Y]ou're going to give me a haircut." When petitioner said she was not going to cut his hair, he demanded to know why not. She told him that she was about to finish her shift and leave, and that another hair stylist could cut his hair. He was adamant that only she could cut it. He said, "[N]o, you're the only one who knows how to do it!" He then announced that he'd be back, and turned and left.

Respondent told a much different story. With regard to whether respondent parked his mail truck in front of the salon for long periods, respondent claimed it would have been impossible to complete his route on time if he had done so. He said that he uses an electronic device that records his whereabouts as he completes his mail route and those records would prove that he never parked in front of the salon for extended periods of time. Respondent did not, however, produce those records as evidence. Respondent also claimed that he had no choice where to park. He indicated that, by direct order of his supervisor, he was to park in the first available spot, which was a disabled parking spot in front of the salon. If it was occupied, he could park in the next available spot. Respondent further asserted that he objected to parking in the disabled parking spot and finally had to bring a grievance through the union to force the supervisor to retract the order. Respondent did not corroborate his assertion by calling his supervisor or a union representative as a witness, nor did he

produce any documentation of the order or the grievance. His assertions in those regards were supported only by his own testimony.

With regard to his interactions with petitioner, respondent's testimony directly contradicted petitioner's. According to respondent, it was petitioner's idea, not his, that she should begin cutting his hair. Also according to respondent, it was petitioner, not he, who became sexually solicitous. Specifically, respondent testified that petitioner told him that she was not getting along with her husband and that she was free on Monday nights. Respondent also testified that, during the haircuts, petitioner made sexual overtures to him in the form of highly specific and graphic sexual comments and invitations, ones that "flabbergasted" him and were very embarrassing for him. Respondent told his girlfriend about petitioner's sexual overtures to him and, according to respondent, his girlfriend became jealous, called petitioner to make her leave respondent alone, and was just "fishing" when she accused petitioner of having an affair with respondent. Respondent acknowledged that he has found himself in situations like those in the past. He explained that those situations arise because "[w]omen like me."

With that factual context, we turn to respondent's legal arguments on appeal. As noted, respondent's principal challenge is to the sufficiency of the evidence to support issuance of the SPO. We therefore discuss that challenge first and then address respondent's additional challenges.

■     A court may issue an SPO against someone who intentionally, knowingly, or recklessly makes repeated and unwanted contact with another person, or a member of that person's immediate family or household, causing that person to be alarmed or coerced. ORS 163.738(2)(a)(B)(i). The contact may consist of, among other things, coming into the person's visual or physical presence, following the person, waiting outside the person's home, property, place of work or school, or sending or making written communications of any kind. *See* ORS 163.730(3) (providing definition of "contact" for both the civil and criminal stalking statutes); *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). Additionally, a person seeking the SPO must prove that he or she in fact

was alarmed or coerced as a result of the repeated and unwanted contacts, and it must be objectively reasonable for that person to have been alarmed or coerced. *See Weatherly,* 169 Or App at 259 (discussing subjective and objective components). "Alarm," for purposes of the issuance of an SPO, means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Coerce" means "to restrain, compel or dominate by force or threat." ORS 163.730(2). Finally, the repeated and unwanted contacts must also cause the person reasonable apprehension regarding his or her personal safety or the safety of a member of his or her immediate family or household. ORS 163.738(2)(a)(B)(iii).

■　　Potential constitutional problems arise when a petitioner relies on contacts that involve expression. In that circumstance, to avoid constitutional overbreadth problems, the contacts must meet a more stringent standard than the one set out in the statute. *See State v. Rangel,* 328 Or 294, 300, 977 P2d 379 (1999); *see also Hanzo,* 152 Or App at 542. That more stringent standard requires the contacted person to prove that the contacts involved threats that "instill[ ] in the addressee a fear of imminent and serious personal violence from the speaker, [are] unequivocal, and [are] objectively likely to be followed by unlawful acts." *Rangel,* 328 Or at 303. Contacts that do not involve expression need to satisfy only the less stringent statutory standard. *Boyd v. Essin,* 170 Or App 509, 514, 12 P3d 1003 (2000), *rev den,* 331 Or 674 (2001).

■　　In challenging the evidence as insufficient, respondent first focuses on the expressive contacts—such as respondent's sexual overtures and statements he made in other interactions with petitioner, such as his demand for a haircut. Respondent urges that none of those expressive contacts meet the exacting standard required for potentially constitutionally protected expression. We agree. Those expressions do not unequivocally equate with a threat that would instill in a reasonable person a fear of imminent and serious personal violence, as *Rangel* requires. We therefore do not consider them as contacts in determining whether the statutory standards for issuance of the SPO were satisfied.

Those expressive contacts, nevertheless, are relevant context for respondent's nonexpressive contacts with petitioner. *See Castro v. Heinzman*, 194 Or App 7, 14, 92 P3d 758 (2004). The nonexpressive contacts that we properly can consider primarily consisted of respondent parking directly in front of or near the salon and within petitioner's sight for protracted periods of time. We also consider respondent's menacing glares at petitioner after her coworker complained about respondent's behavior; respondent's conduct in attempting to flag down petitioner when she was alone in her car; respondent approaching petitioner while she was sitting in front of the salon and aggressively trying to maintain eye contact with her while backing away; and respondent coming into the salon in the evening without an appointment for a haircut. Thus, in considering the effect of those contacts on petitioner and on a reasonable person in petitioner's position, we may consider as context respondent's persistent and inappropriate sexual overtures, along with his directive and demanding style of interaction.

From that evidence, we conclude that the requirements for issuance of an SPO were met. Respondent came into petitioner's visual and physical presence, waited outside her workplace, parked in places and in ways that were intrusive and attention-seeking, and did so repeatedly. Those behaviors were "contacts" within the meaning of the statute, and they were repeated. We are also satisfied that they were unwanted and that respondent was aware of that.[2] At the least, respondent knew that the contacts were unwanted once petitioner's coworker complained on her behalf to the postal service. Not only should respondent have been aware that petitioner did not want him lurking in the parking lot or around her from that point forward, respondent's own behavior shows he was so aware—he stopped lurking, at least to the same degree. He continued to park there longer and more frequently than his duties required, but less so than before the complaint. His ongoing conduct in that regard provides further evidence of "repeated contacts," ones that by then he

---

[2] In that regard, this case differs from its companion case, *Courtemanche v. Milligan*, 205 Or App 244, 134 P3d 999 (2006), in which we determined that the petitioner failed to show that the respondent was aware that his contacts were unwanted by her.

knew were unwanted.[3] Also, the last three contacts that respondent initiated (*i.e.*, trying to flag down petitioner while she was in her car alone; confronting her while she was taking a break with coworkers in front of the salon; and coming into the salon in the evening without a haircut appointment) all involved nonexpressive contact that we can also consider, and all occurred when respondent was well aware that the contacts were unwanted.

■     The remaining question is whether petitioner was subjectively and objectively alarmed by those contacts. Petitioner's subjective alarm is amply established by the record. Respondent's rebuffed but persistent solicitations made petitioner uncomfortable; respondent's behavior in parking directly in front of the salon, or within sight, for protracted periods, and sometimes parking backwards and watching petitioner in his rearview mirror, unnerved petitioner and made her apprehensive; she was afraid to go to her car in the evening without someone escorting her or at least watching her. The reasonable inference from her testimony is that, due to respondent's contacts, petitioner felt actual and real apprehension for her safety, which is what the statute requires to meet the subjective alarm prong.

---

[3] On appeal, respondent devotes significant argument to his claim that none of those contacts can be considered because they were in the course of his official duties. *See* ORS 163.755(1)(c)(B) (SPO cannot issue for conduct that is authorized by federal law or is otherwise within the scope of·a person's official duties). The trial court appeared explicitly to discredit respondent's testimony that any of his conduct, beyond the actual delivery of mail to the salon, was required by his official position. The court stated, "What I think is involved here are verbal behaviors, which have some limitations on them, but they are also physical behaviors, which to me—from the testimony—seem to be repeated intrusive presence *when it's not in the course of employment, and when it's beyond just the strict duties of delivering mail.*" (Emphasis added.) The trial court's issuance of the SPO also implicitly rejected respondent's explanation of his conduct. What is more, even on a cold record, respondent's testimony is not credible in many areas; thus, we would not be inclined to give weight to any of it. Credibility depends not only on demeanor but also on factors that a reviewing court or body can assess, such as " 'inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact that it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human experience demonstrates it is logically incredible.' " *Allen v. Meinig,* 109 Or App 341, 347-48, 819 P2d 744 (1991), *rev den,* 313 Or 209 (1992) (quoting *Lewis and Clark College v. Bureau of Labor,* 43 Or App 245, 256, 602 P2d 1161 (1979), *rev den,* 288 Or 667 (1980) (Richardson, J., concurring in part, dissenting in part)). We therefore do not consider further respondent's arguments as to the official character of his conduct.

We also conclude that petitioner's alarm was objectively reasonable. In that regard, *Bryant v. Walker*, 190 Or App 253, 78 P3d 148 (2003), is factually analogous. In that case, for a period of two years, the respondent went to the department store where the petitioner worked, followed the petitioner around, and stared at her ominously and in a sexually suggestive fashion. *Id.* at 255. At one point, the petitioner asked the respondent, "What are you looking at?" and the respondent said, "Oh you look nice," to which she replied, "You don't need to stare." *Id.* The respondent continued to follow the petitioner around the store, but they never spoke again. The petitioner learned from a coworker that the respondent's ex-wife had petitioned for a restraining order against him on the grounds that he was abusive and violent. Further, the petitioner saw the respondent drive by her house one day, but could not tell if he saw her or not. In concluding that the petitioner's alarm was objectively reasonable for a person in her situation, we noted that, even though no overt threats occurred and the significant contacts all occurred in a public place, the facts that the petitioner, a 22-year-old woman, thought that the respondent might know her address and that she had information about an accusation of violent behavior in the respondent's past were sufficient to establish the objective reasonableness of her subjective alarm. *Id.* at 257.

Here, too, no overt threats were made, and the significant contacts all occurred in public places. On the other hand, respondent knew where petitioner worked; knew when her shift ended; was demanding, directive, and inappropriately solicitous; and had obsessively directed unwanted attention to petitioner. Add to those circumstances the fact that other people were concerned on petitioner's behalf and took steps to protect her and that petitioner had been told by respondent's girlfriend that the girlfriend feared personal harm from him. A key factual difference between this case and *Bryant* is that, here, unlike in *Bryant*, respondent was the local mail carrier rather than a complete stranger. But that adds to the reasonableness of petitioner's alarm rather than detracts from it. It reveals respondent's willingness to abuse his official position by protracting his "breaks" and keeping less than professional distance with a person on his

official mail route, a fact that not only hypothetically could have consequences for respondent's employment, but in this case in fact did.[4] That respondent was willing to engage in that behavior despite the potential consequences, together with the circumstances suggesting the reasonableness of petitioner's alarm, amply satisfies us that petitioner's alarm was as reasonable as it was actual.

Respondent's remaining assignments of error need not detain us. He argues, first, that the trial court erred in *sua sponte* consolidating this case with another one seeking a similar SPO by another person on respondent's route. The issue is unpreserved and does not merit consideration under the plain error doctrine, because the error readily could have been avoided had it been raised. *See State v. Thackaberry*, 194 Or App 511, 517, 95 P3d 1142 (2004) (court declined to reach issue as plain error where error likely could have been avoided had it been raised at trial). Even if we were to consider it, however, our *de novo* review precludes any relief on appeal. We have considered the sufficiency of the evidence to support the SPO based on the evidence relevant to this case only.

Next, respondent argues that the trial court issued the SPO after finding that "probable cause" rather than preponderant evidence supports the SPO. *See Hulburt v. Delaney*, 197 Or App 437, 440, 106 P3d 171 (2005) (judgment in SPO case defective because court found only probable cause to believe that alleged acts were committed; correct standard is preponderance of the evidence). This case differs from *Hulburt* in that the trial court orally made the correct finding—one based on the court's assessment of the preponderance of the evidence. The court then filled out a standard form of judgment, one in which the court could place a mark in a blank space next to either the probable cause or preponderance of the evidence standard of proof. The court placed a mark next to probable cause. Under the circumstances, that appears to have been a scrivener's error. To be sure, a written order generally governs over a court's oral statements. *Stevens v. Czerniak*, 336 Or 392, 397-98, 84 P3d 140 (2004)

---

[4] The record shows that, at the time of the SPO hearing, respondent had been suspended from his job without pay due to his conduct.

(citing *State v. Swain/Goldsmith*, 267 Or 527, 530, 517 P2d 684 (1974)). The application of that general rule in a circumstance involving a "check the box" form order is less than clear, however. In all events, our review is *de novo*. We are satisfied that a preponderance of the evidence supports the issuance of the SPO.

Finally, respondent argues that certain hearsay evidence should not have been admitted over petitioner's objection. Regardless of the correctness of the trial court's ruling, we have not considered that evidence on appeal in our *de novo* review. The issue therefore provides no basis for reversal.

Affirmed.