Argued and submitted January 4, reversed July 23, 2008

Holly Bryn SPARKS,
*Petitioner-Respondent,*

*v.*

Dennis Richard DEVENY,
*Respondent-Appellant.*

Clackamas County Circuit Court
CV06070754; A134432

189 P3d 1268

Steven R. Scharfstein argued the cause and filed the brief for appellant.

No appearance for respondent.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Respondent appeals a judgment granting petitioner's request for a permanent stalking protective order (SPO), challenging the legal sufficiency of the evidence to support the order.[1] On *de novo* review, *Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999), we reverse.

The parties became acquainted through church. Petitioner was a member of the church congregation, and respondent was a counselor at the church. In April 2004, petitioner, who was married at the time, sought counseling from respondent to treat depression and anxiety. Through the counseling sessions, the parties became "very close," and ultimately their relationship evolved into an "inappropriate" and "intimate" relationship. Eventually, petitioner confided in other church members about her relationship with respondent and expressed that it had become "unhealthy." In December 2004, when word of the relationship reached church officials, respondent was fired and instructed to have no further contact with petitioner.

After his termination, respondent had no contact with petitioner until October 2005, by which time petitioner had divorced her previous husband and remarried. In October 2005, petitioner was driving to her new husband's workplace with her four-year-old son. Respondent pulled his car behind petitioner's and began following her. Petitioner testified that, while respondent was following her, she was concerned and wanted to avoid a confrontation between herself, respondent, and her husband—especially in front of her son. To avoid that situation, petitioner pulled into a parking lot before reaching her husband's workplace, remained in her car, and spoke briefly to respondent through the car window. Respondent explained that he wanted petitioner's address so that he could send a card congratulating her on her recent marriage. Petitioner "[r]eluctantly" agreed and provided

---

[1] In stalking cases, we refer to the parties by their status in the trial court. *See Edwards v. Biehler*, 203 Or App 271, 273 n 1, 124 P3d 1256 (2005). We therefore refer to Deveny, the appellant before us, as "respondent" and refer to Sparks as "petitioner."

respondent with her home address. Subsequently, respondent sent petitioner and her husband a wedding card.

Shortly after that incident, petitioner learned that respondent had been e-mailing her ex-husband—to whom petitioner was married at the time she had the relationship with respondent. Petitioner's ex-husband agreed to correspond with respondent through e-mail. In one e-mail, respondent discussed the incident in October 2005 in which he followed petitioner in her car. In that e-mail, respondent apologized to petitioner's ex-husband for scaring petitioner by following her and promised not to contact her again.

Sometime after the October 2005 incident, respondent started "showing up" at the gym where petitioner exercised and started to regularly attend the exercise class that petitioner attended.[2] Petitioner testified that she was "very alarmed" by respondent's presence at the exercise class but had decided to ignore him. After one exercise class, respondent followed petitioner out of the class and said, "I sense that you are uneasy." In response, petitioner acknowledged that she was alarmed, and she told respondent to stop coming to the gym, to stay away from her, not to follow her, not to write to her, and not to talk to her. Respondent replied, "Understood." However, despite his professed agreement not to attend the exercise class, respondent continued to attend. Petitioner testified that she felt threatened by respondent's continued presence in the exercise class, so she eventually stopped attending.

Respondent also continued to contact petitioner by mail. He sent petitioner and her husband a Christmas card in 2005. In February 2006, respondent sent petitioner's husband—whom respondent had never met—a long letter, which described, among other things, his relationship with petitioner in 2004.

In July 2006, respondent starting calling petitioner's house. In several of the telephone calls, respondent hung up the phone without saying anything.[3] However, during one

---

[2] Respondent had been a member of the gym for over 10 years.

[3] Petitioner's husband took photographs of the caller ID, which indicated that the terminated phone calls originated from respondent's phone.

call respondent spoke with petitioner's husband, who repeatedly told respondent to "leave us alone," but respondent persisted to tell petitioner's husband that he needed to tell him things about petitioner and that respondent had "unfinished business" with her. Eventually, petitioner's husband hung up the phone. Respondent immediately called back, but petitioner's husband did not answer.

That same month, petitioner filed a stalking complaint in Clackamas County. A show cause hearing was held. At the close of the hearing, on the basis of the facts described above, the court granted an SPO prohibiting respondent from any further contact with petitioner. The court explained its reasoning,

> "What concerns me of this case, is that we have this repeated and unwanted contact despite being told repeatedly in no uncertain terms that all contact was to stop. I mean the contact was not only the repeated calls, but also the showing up at the gym class, following in the car—and I think the irrationality of that would reasonably give someone concern."

On appeal, respondent contends that the court erred in entering the SPO because the evidence does not show that he intentionally, knowingly, or recklessly engaged in two or more unwanted contacts that actually alarmed petitioner and that reasonably put her in fear for her personal safety.[4] We agree with one of respondent's arguments; accordingly, we reverse.

■■ ORS 30.866(1) provides that a court may enter an SPO under the following circumstances:

> "(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

> "(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

---

[4] Petitioner did not appear on appeal.

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

To obtain an SPO under that statute, a petitioner must establish several things. The petitioner must establish that, on at least two occasions, the respondent contacted the petitioner while subjectively "aware of a substantial and unjustifiable risk" that the contact was "unwanted by the [petitioner], and then consciously and unreasonably disregard that risk." *Delgado v. Souders*, 334 Or 122, 133, 46 P3d 729 (2002). The contact may consist of, among other things, coming into the person's visual or physical presence, following the person, or sending or making written or electronic communications in any form. *See* ORS 163.730(3) (defining "contact" for both the civil and criminal stalking statutes). Additionally, a petitioner must prove that he or she was in fact alarmed or coerced as a result of the repeated and unwanted contacts, and it must have been objectively reasonable for the petitioner to have been alarmed or coerced. *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000) (explaining that the statute has both subjective and objective components); *see* ORS 163.730(1) (" 'Alarm' means to cause apprehension or fear resulting from the perception of danger."); ORS 163.730(2) (" 'Coerce' means to restrain, compel or dominate by force or threat."). Finally, a petitioner must establish that the repeated and unwanted contacts caused the petitioner reasonable apprehension regarding his or her personal safety or the safety of a member of his or her immediate family or household. ORS 30.866(1)(c).

Under Article I, section 8, of the Oregon Constitution, contacts that consist of speech are subject to a heightened standard of proof.[5] To qualify as a predicate unwanted contact, any contact that consists of speech must be a threat—that is, the sort of communication that "instills in the addressee a fear of imminent and serious personal violence

___

[5] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999).

We turn to the contacts in this case to determine whether they meet the foregoing standards for issuance of an SPO. The contacts fall into two categories: those that consist of expressive communication and those that involved forms of nonexpressive contact. The majority of contacts in this case involve expressive communication—*i.e.*, cards and letters, e-mails, and telephone calls. *See Middleton v. Tully*, 211 Or App 198, 201, 154 P3d 170 (2007) (explaining that "[t]elephonic communications and messages constitute speech that is subject to the protection of Article I, section 8"); *cf. State v. Shields*, 184 Or App 505, 511, 56 P3d 937 (2002), *rev den*, 335 Or 355 (2003) (hang-up phone calls are nonexpressive acts that can be treated as "contacts"). In sum, we agree with respondent that none of the expressive contacts here satisfies the exacting constitutional standard announced in *Rangel*.

■ Without a doubt, respondent's relentless contact with petitioner and her family by sending her cards and letters and repeatedly calling her home was boorish, obsessive, and troubling; however, those expressive contacts do not unequivocally equate with a threat that would instill in a reasonable person a fear of imminent and serious personal violence as *Rangel* requires.[6] We therefore do not consider them as predicate "contacts" in determining whether the statutory standards for issuance of the SPO were satisfied.[7]

---

[6] Additionally, we do not consider respondent's contact with petitioner's ex-husband to constitute a predicate "contact" that would support an SPO under ORS 30.866(1), because petitioner's ex-husband is not a member of her "immediate family or household." *See* ORS 163.730(4) (defining "household member"); ORS 163.730(5) (defining "immediate family").

[7] As we explained in *Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006), although expressive contacts that do not meet the stringent standard announced in *Rangel* cannot be considered as a predicate unwanted contact to support an SPO, the expressive contacts "nevertheless, are relevant context for respondent's nonexpressive contacts with petitioner." Here, in considering the effect of the nonexpressive contacts on petitioner and on a reasonable person in petitioner's position, we consider as context respondent's persistent and relentless attempts to interact with petitioner despite clear instructions from several people to stop contacting her.

■  The nonexpressive contacts that we can properly consider consist of (1) respondent following petitioner in her car in October 2005; (2) respondent's attendance at the gym; and (3) respondent's phone calls when he hung up the phone without saying anything.[8] The question is whether those contacts are sufficient to satisfy the statutory requirements for issuance of an SPO under ORS 30.866(1). Assuming that the evidence is sufficient to demonstrate that respondent knowingly engaged in repeated and unwanted contact with petitioner, which caused petitioner objectively reasonable alarm, ORS 30.866(1)(a), (b), the evidence in this record falls short of establishing that the contacts caused petitioner "reasonable apprehension regarding the *personal safety*" of herself or a member of her immediate family or household. ORS 30.866(1)(c) (emphasis added).

We do not question that the contacts caused petitioner real and genuine apprehension and alarm; however, ORS 30.866(1) requires that the contacts cause petitioner apprehension about her personal safety or that of a family member. Personal safety is not necessarily limited to physical safety. However, at the hearing, petitioner testified that she had never seen respondent engage in any kind of physical violence. Petitioner explained,

---

[8] At the show cause hearing, petitioner testified that, a few weeks before the October 2005 incident, she awoke early one morning to see a man, who she could not identify, standing outside her bedroom window. Understandably, petitioner testified that she was "terrified" by the experience.

The trial court considered that evidence as context for issuance of the SPO. The court stated,

"I have to look at that evidence in the context of someone—a man—having shown up outside the Petitioner's window[,] close in time to the commencement of the contacts [by respondent]. We don't have any evidence that that was [respondent], but regardless of who it was, when something like that occurs, and then you have all these repeated, unwanted contacts, closely followed in time by that event, I think that would give someone reasonable concern about their safety."

We agree with the trial court that those circumstances certainly raise reasonable safety concerns. However, because there is nothing in the record, beyond mere speculation, that ties respondent to that occurrence, on *de novo* review, we decline to attribute any weight to that evidence. *See Weatherly*, 169 Or App at 262-63 (declining to consider evidence of contacts when there was no evidence in the record connecting those contacts to the respondent).

"He never directly physically threatened me. No. But I felt very threatened by * * * my ex-husband telling him, my husband telling him, and myself, personally, telling him to his face to leave me alone, no contact, do not write to me, do not talk to me, do not follow me, and he still persisted. That was extremely frightening to me. Very concerning."

When the court asked petitioner, who appeared *pro se*, whether she would like to address evidence about her fear for her personal safety, petitioner explained,

"I did feel as though I knew [respondent] when we had a relationship. As * * * time progressed and these contacts continued to come after he had been told very clearly by a number of people to please stay away and please leave me alone so I can go on with my life, as the contact kept coming and repeating, I became increasingly concerned that he was not the person I thought that I knew.

"* * * * *

"* * * I doubt that I ever really knew this man, I can't say what he is capable of or what he would do. I do know that, like I said, he was told very clearly. It continued. There does seem to be, you know, some time that passed as in between contacts. I don't think he takes this seriously at all. And I feel very certain that the only way he will stay away is to have a permanent Stalking Order."

Petitioner did not identify any apprehension relating to her or anyone else's personal safety, and nothing in the record implies such concerns. *See, e.g., Magyar v. Weinstein*, 211 Or App 86, 91, 153 P3d 135 (2007) (concluding that the petitioner did not prove that the contacts caused him a reasonable apprehension regarding his personal safety). For example, there was no evidence that respondent had a past history of violence. *Habrat v. Milligan*, 208 Or App 229, 239, 145 P3d 180 (2006) (although the contacts themselves were not overtly threatening, the fact that the petitioner was aware that the respondent's girlfriend "feared personal harm from him" added to the reasonableness of the petitioner's concerns); *Castro v. Heinzman*, 194 Or App 7, 15, 92 P3d 758 (2004) (the respondent's conduct in repeatedly approaching the petitioner at the gym despite being told to leave her alone was "particularly disturbing in light of his admission to [the] petitioner that he had been violent toward a former spouse").

In addition to petitioner's testimony, petitioner's ex-husband testified that he had never seen respondent engage in any acts of violence or physical threats. Respondent's wife of 31 years also testified that she had never seen respondent engage in any kind of violence.

In certain instances, the circumstances surrounding contacts may give rise to concerns for personal safety. For example, in *Delgado*, 334 Or at 125, the respondent, on at least two occasions, silently and swiftly walked up behind the petitioner—a stranger—in very close proximity at times when "no other people were nearby and when [the respondent] was walking in a large, unobstructed area" and then quickly walked away and glanced in the petitioner's direction. In this case, however, the contacts are not inherently threatening. With regard to the October 2005 incident in which respondent followed petitioner in her car, petitioner testified that she was concerned and wanted to avoid a confrontation between herself, respondent, and her husband. It is not at all apparent from the record before us that petitioner was anticipating a confrontation that would threaten her personal safety. In fact, the record suggests that petitioner was concerned about having to discuss her relationship with respondent in front of her new husband because, as she explained, her "husband knew who [respondent] was and because [her] four-year-old son was in the car."

With regard to respondent's presence at the exercise class, the record is likewise deficient. Petitioner testified that respondent started attending the exercise classes and continued to attend after she told him to stop. Although petitioner testified that respondent's presence at the classes was "threatening," the record does not indicate what exactly respondent did during the exercise classes—in addition to merely being present—that petitioner found threatening. Specifically, there is no evidence that respondent behaved in a way during the class that would have given rise to concerns for "personal safety"—for example, there is no evidence that respondent glared at petitioner throughout the class or made other threatening gestures.

Lastly, with respect to the hang-up phone calls, there is no evidence in the record that those calls caused petitioner reasonable apprehension about her personal safety or that of a family member.

We in no way intend to diminish petitioner's concerns or condone respondent's behavior but, on the limited record before us, we cannot say that the contacts—inherently or in light of the surrounding circumstances—caused petitioner reasonable apprehension for her personal safety or the personal safety of a member of her immediate family or household. Accordingly, the trial court erred in entering the permanent SPO.

Reversed.