Submitted August 21, 2014, reversed July 22, 2015

Sylvia J. ROTH,
*Petitioner-Respondent,*

*v.*

Joseph KING, Jr.,
*Respondent-Appellant.*

Marion County Circuit Court
13C11488; A155338

356 P3d 153

R. Grant Cook and Lafky & Lafky filed the brief for appellant.

No appearance for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Wollheim, Senior Judge.

DUNCAN, P. J.

**DUNCAN, P. J.**

Respondent appeals the stalking protective order (SPO) entered against him, asserting that it was not supported by sufficient evidence. For the reasons explained below, we agree and, therefore, reverse.

We have the discretion to conduct *de novo* review in SPO cases, but respondent has not identified, and we do not perceive, any reason to do so in this case. *See* ORS 19.415(3) (*de novo* review is discretionary in equitable actions); ORAP 5.40(8)(c) (*de novo* review is appropriate only in "exceptional cases"). Accordingly, we are bound by the trial court's findings if they are supported by "any evidence," and we review its legal conclusions for errors of law. *Noriega v. Parsons*, 253 Or App 768, 770, 296 P3d 522 (2012) (internal quotation marks omitted).

Stated in accordance with that standard, the relevant facts are as follows. At the time petitioner filed her petition for an SPO, on August 13, 2013, she and respondent had known each other for approximately five years. They were coworkers and attended the same church. Over the years, respondent flirted with petitioner, and she responded either by ignoring him or telling him to stop. When she told him to stop, he would stop for a short period of time, but then he would resume flirting and making sexual advances. Petitioner repeatedly rejected respondent's advances. At two or more points, petitioner told respondent that she did not want him to communicate with her and communications ceased, but later resumed.

The parties were in communication for at least four months before petitioner filed her SPO petition. During those months, petitioner moved into a new house and respondent helped her move. Petitioner also gave respondent a key to her house so that he could let her dogs out while she was on a trip.

But the parties' relationship turned again after respondent sent petitioner numerous text messages expressing his interest in her. According to petitioner, in some of those messages, respondent stated that he wanted to "[lie] naked with [petitioner]" and other "random weird stuff." On

August 8 or 9, 2013, petitioner sent respondent several text messages telling him to stop contacting her. She then asked him to return her house key. In response, respondent left petitioner multiple voice messages; in one, he stated that he was at her house and was not going to leave until petitioner returned home, and, in another, he stated that he needed to return to petitioner's house to shut her water off.[1] Those messages alarmed petitioner, and she went to a police station to report respondent's conduct.

At the police station, petitioner spoke with an officer, who reviewed the parties' text messages from that day. The officer noted that petitioner had instructed respondent not to contact her anymore, but that respondent had continued to call and send petitioner messages. The officer also noted that respondent's message that he was waiting at petitioner's house was "in reference to returning [petitioner's] house key."

Petitioner told the officer that, although respondent "ha[d] not shown indications of being a violent person," she was "becoming very afraid due to [his] continued and escalating pursuit of her." Petitioner asked the officer to tell respondent not to contact her by phone and to issue respondent a trespass warning to prohibit him from coming to her home.

The officer drove petitioner to her home. Respondent was not there, but he had left her house key under her doormat. He also had left several pots of flowers on her front porch, along with scented soap bars and decorative signs that, according to the officer, "hint[ed]" at his "dreams of dating [petitioner]." Petitioner was very upset by respondent's actions.

The officer called respondent, who said that he did not have any ill intentions toward petitioner and that they were friends. The officer told respondent that his actions toward petitioner were unwanted and had caused her to be afraid. He also told respondent that he was already subject to arrest for telephonic harassment for his past conduct

---

[1] Petitioner later discovered that respondent had left her water on in order to water flowers he had left on petitioner's porch.

toward petitioner and that, if he made any future efforts to contact petitioner, the officer would arrest him immediately.

On August 12, 2013, petitioner saw respondent at church. According to petitioner, respondent approached her, but she had another person stand between them. Respondent and the other person greeted each other, but respondent did not communicate with petitioner.

On August 13, 2013, respondent called petitioner, but she did not answer. He then sent her a text message asking, "Hey kiddo where you at?" The police subsequently arrested respondent for telephonic harassment and stalking, and petitioner filed the petition in this case seeking a permanent SPO against respondent.

At the SPO hearing, petitioner testified that respondent had never threatened her, nor acted violently toward her, but respondent had been "verbally" violent toward coworkers. Petitioner also testified that she began to fear imminent harm when, on August 9, respondent communicated to her that he was waiting at her house.

Respondent contended that all of his contacts with petitioner were "communicative statements" and, therefore, in order to issue an SPO, the court had to find that each statement was a threat that was "unambiguous, unequivocal and specific to the addressee" and that each convincingly expressed "that the intention of the respondent here will be carried out." Additionally, respondent contended that, given the totality of the circumstances—including "the length of the relationship [between the parties], the fact that there had been *** off-again and on-again form of communication[,] [t]he fact that there had even been the giving of a key to this house, [and] the fact that the forms of the communication were expressions of affections"—an objectively reasonable person would not consider respondent's statement that he was not going to leave petitioner's home to be an unambiguous threat of imminent harm.

The trial court concluded that respondent's contacts with petitioner were not solely communicative: "Leaving of items at her home, approaching her and attempting to make contact are acts. It doesn't have to be physical touching to

be more than communicative." The trial court also concluded that it was objectively reasonable for petitioner to be "afraid or distressed by that behavior." Regarding respondent's communications with petitioner, the trial court concluded that, based on the context of the parties' relationship and respondent's behavior, respondent's statement that he was not going to leave petitioner's house until she returned, and his statement that "I want to lie naked with you," were threats. The trial court issued a permanent SPO against respondent, and this appeal followed.

On appeal, respondent argues that there was insufficient evidence to justify issuance of the SPO. Specifically, he argues (1) that the majority of the contacts in this case were text messages and telephone calls, and none of those communications amounted to threats, and (2) that his visit to petitioner's home did not constitute an unwanted contact because it was pursuant to petitioner's request that respondent return her house key.

The requirements for the issuance of an SPO are set forth in ORS 30.866, which provides, in part:

"(1) A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

Under ORS 163.730(7), "'[r]epeated' means two or more times." Therefore, "to qualify for an SPO, a petitioner must show by a preponderance of the evidence that the respondent made at least two contacts with the petitioner or the petitioner's family within the two years immediately preceding

the filing of the motion for an SPO[.]" *Layne v. MacDonald*, 267 Or App 628, 630-31, 340 P3d 773 (2014). Each contact must give rise to subjective and objective reasonable alarm or coercion. *Christensen v. Carter/Bosket*, 261 Or App 133, 139-40, 323 P3d 348 (2014); *Reitz v. Erazo*, 248 Or App 700, 706, 274 P3d 214 (2012). Under ORS 163.730(1), "'[a]larm' means to cause apprehension or fear resulting from the perception of danger." "Danger" refers to "a threat of physical injury, not merely a threat of annoyance or harassment." *Reitz*, 248 Or App at 706-07.

Finally, in the case of a speech-based contact, Article I, section 8, of the Oregon Constitution requires that the petitioner prove that the contact constitutes a "threat." *State v. Rangel*, 328 Or 294, 302-03, 977 P2d 379 (1999). A "threat" is "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Id.* at 303. Under *Rangel*, the threat must be "so unambiguous, unequivocal, and specific to the addressee that it convincingly expresses *to the addressee* the intention that it will be carried out *** and that the actor has the ability to do so." *Id.* at 306 (emphasis in original). Threats do not include "'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Id.* at 303 (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)).

Here, we conclude that the evidence that the trial court relied on—respondent's communications with petitioner, respondent's visit to petitioner's home, and respondent approaching petitioner at church—does not permit the finding that respondent engaged in the type of contact required for issuance of an SPO. As we explain below, respondent's expressive contacts with petitioner do not constitute qualifying contacts because they were not threats, as defined by *Rangel*. And, respondent's contact with petitioner at her church does not constitute a qualifying contact because respondent's actions at the church were insufficient to give rise to objectively reasonable alarm. The only remaining contact is respondent's visit to petitioner's home,

and, because an SPO must be based on two or more qualifying contacts, we need not decide whether the visit constitutes a qualifying contact.

We begin with respondent's expressive contacts: the text and voice messages he sent to petitioner and the decorative signs he left at her home. Because the messages and signs were communications, they must meet *Rangel*'s requirements before they may be considered qualifying contacts for purposes of ORS 30.866. *Christensen*, 261 Or App at 140. They do not. None of respondent's communications expressed an intention to harm petitioner. And, there was no indication from the parties' history that respondent would harm petitioner, as respondent had never been physically violent toward petitioner or, as far as petitioner knew, anyone else. Although respondent's communications were unwanted and some were sexual in nature or expressed an intention to contact petitioner in person, they did not suggest that respondent would engage in unlawful or violent conduct. Thus, we cannot conclude that respondent's communications qualify as "threats" under *Rangel*, which, as mentioned, provides that, to be the basis for an SPO, a communication must give rise to an objectively reasonable "fear of imminent and serious personal violence," be "unequivocal," and be "objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303; *see, e.g., Noriega*, 253 Or App at 771, 775 (the respondent's statement that he was going to "confront" the petitioner in front of her coworkers or husband was not a threat because "no evidence suggest[ed] that such a confrontation probably would involve violence or other unlawful acts"); *Habrat v. Milligan*, 208 Or App 229, 236, 145 P3d 180 (2006) (the respondent's sexual overtures to the petitioner, without more, were not threats under *Rangel*); *Michieli v. Morgan*, 192 Or App 550, 552-55, 86 P3d 688 (2004) (the respondent's emails and letters to the petitioner, which expressed his romantic interest in her and which were sent after she repeatedly asked him not to contact her, were insufficient to satisfy *Rangel* because, even though they caused the petitioner to be afraid, nothing in the content or context of the communications indicates that the petitioner was in danger or that the communications would be followed by unlawful acts).

Because none of respondent's communications satisfies *Rangel*, we turn to respondent's nonexpressive contacts: respondent's visit to petitioner's home and his presence near her at church. We conclude that, under *Sparks v. Deveny*, 221 Or App 283, 189 P3d 1268 (2008), respondent's actions at the church do not qualify as a contact.

In *Sparks*, the respondent was the petitioner's former counselor, and the two had a romantic relationship for a period of time. After their relationship ended, the respondent communicated with the petitioner's ex-husband, began showing up to the petitioner's exercise classes, and, on one occasion, followed the petitioner. 221 Or App at 285-86. The petitioner was alarmed by the respondent's presence in her exercise classes, and she told him to stop coming to the gym, to stay away from her, and not to contact her. Nevertheless, the respondent continued to attend the petitioner's exercise classes, and the petitioner felt threatened by his continued presence. *Id.* at 286.

On appeal, we concluded that the respondent's presence at the exercise classes was insufficient to give rise to objectively reasonable alarm, stating that,

"[a]lthough petitioner testified that respondent's presence at the classes was 'threatening,' the record does not indicate what exactly respondent did during the exercise classes—in addition to merely being present—that petitioner found threatening. Specifically, there is no evidence that respondent behaved in a way during the class that would have given rise to concerns for 'personal safety'—for example, there is no evidence that respondent glared at petitioner throughout the class or made other threatening gestures."

*Id.* at 292.

Similarly, in this case, there is no evidence that respondent behaved in a threatening manner when he approached petitioner at church. Rather, respondent, who attended the church, exchanged greetings with someone else and did not communicate with petitioner. Therefore, like the respondent's presence at the petitioner's exercise classes in *Sparks*, respondent's encounter with petitioner at church was not a qualifying contact.

Because more than one qualifying contact is required for issuance of an SPO, we need not determine whether the one remaining contact in this case—respondent's visit to petitioner's home—is a qualifying contact. *Farris v. Johnson*, 222 Or App 377, 383, 193 P3d 66 (2008) ("[A]n SPO cannot be issued based on a single contact."). Without two qualifying contacts, there was insufficient evidence to support the issuance of the SPO.

Reversed.